

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES EVERETT SHELTON, | Case No. |
| Plaintiff, | |
| v. | CLASS ACTION COMPLAINT |
| DIRECT ENERGY, LP and KAA ENERGY, INC., | |
| Defendants. | |

### CLASS ACTION COMPLAINT

#### Preliminary Statement

1. As the Supreme Court explained at the end of its term this year, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The states likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress have been fighting back. As relevant here, the Telephone Consumer Protection Act of 1991, known as the TCPA, generally prohibits robocalls to cell phones and home phones." *Barr v. Am. Ass'n of Political Consultants*, No. 19-631, 2020 U.S. LEXIS 3544, at *5 (July 6, 2020).

2. Plaintiff James Everett Shelton ("Plaintiff" or "Mr. Shelton") brings this action alleging that despite a prior lawsuit against the same parties for the same conduct, Direct Energy, LP ("Direct Energy") hired the co-defendant KAA Energy, Inc. ("KAA Energy"), who made an automated call to the Plaintiff in violation of the TCPA.

3.     The Plaintiff never consented to receive the call that was placed to him for telemarketing purposes and in fact had sued the same parties for making such calls. Because telemarketing campaigns generally place calls to hundreds of thousands or even millions of potential customers *en masse*, the Plaintiff brings this action on behalf of a proposed nationwide class of other persons who received illegal telemarketing calls from or on behalf of Defendants.

4.     A class action is the best means of obtaining redress for the Defendants' wide-scale illegal telemarketing and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

## Parties

5.     Plaintiff James Everett Shelton is a Pennsylvania resident and a resident of this district.

6.     Defendant KAA Energy, Inc. is a Texas corporation. KAA Energy engages in telemarketing into this district, as it did with the Plaintiff.

7.     Defendant Direct Energy, LP is a Texas limited partnership. Direct Energy services energy customers in this district, as it would have done with the Plaintiff if KAA Energy had completed their sale.

## Jurisdiction & Venue

8.     The Court has federal question subject matter jurisdiction over these TCPA claims. *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740 (2012).

9.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district, as the telemarketing call to the Plaintiff was placed into this district.

### The Telephone Consumer Protection Act

10. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing ... can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

The TCPA Prohibits Automated Telemarketing Calls

11. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service ... or any service for which the called party is charged for the call." See 47 U.S.C. § 227(b)(1)(A)(iii).

12. The TCPA provides a private cause of action to persons who receive calls in violation of 47 U.S.C. § 227(b)(1)(A). See 47 U.S.C. § 227(b)(3).

13. The TCPA also makes it unlawful to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party. See 47 U.S.C. § 227(b)(1)(B).

14. According to findings by the Federal Communication Commission ("FCC"), the agency Congress vested with authority to issue regulations implementing the TCPA, such calls are prohibited because, as Congress found, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live solicitation calls, and such calls can be costly and inconvenient.

15. In 2013, the FCC required prior express written consent for all autodialed or prerecorded telemarketing calls ("robocalls") to wireless numbers, services for which the called party is charged for the call, and residential lines. Specifically, it ordered that:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received "clear and conspicuous disclosure" of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained "without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service."

*In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 (2012) (footnotes omitted).

The Growing Problem of Automated Telemarketing

16. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting Off Robocalls*, FCC, (July 22, 2016, 10:30 AM), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls [https://archive.is/w2afC] (statement of FCC chairman).

17. "The FTC receives more complaints about unwanted calls than all other complaints combined." Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016), https://www.ftc.gov/policy/advocacy/advocacy-filings/2016/06/ftc-staff-comment-federal-communications-commission-rules.

18. In fiscal year 2017, the FTC received 4,501,967 complaints about robocalls, compared with 3,401,614 in 2016. Fed. Trade Comm'n, *FTC Releases FY 2017 National Do*

*Not Call Registry Data Book and DNC Mini Site* (Dec. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-national-do-not-call-registry-data-book-dnc [https://archive.is/oPZSW].

19. Industry data shows that the number of robocalls made each month increased from 831 million in September 2015 to 4.7 billion in December 2018—a 466% increase in three years. *U.S. Endures 4.7 Billion Robocalls in July, According to YouMail Robocall Index*, YOUMAIL (Aug. 6, 2019, 9:00 AM), https://www.prnewswire.com/news-releases/us-endures-4-7-billion-robocalls-in-july-according-to-youmail-robocall-index-300895976.html [https://archive.is/pnU5s].

20. According to online robocall tracking service YouMail, 5.6 billion robocalls were placed in October 2019 at a rate of approximately 180.6 million per day. *Robocall Index*, YOUMAIL, https://robocallindex.com/ (last visited Aug. 6, 2020) [https://archive.is/fwZD8]. In 2019, YouMail's robocall totals exceeded 58.5 billion. *Historical Robocalls By Time*, YOUMAIL, https://robocallindex.com/history/time (last visited Aug. 6, 2020) [https://archive.is/XWefY].

21. The FCC also has received an increasing number of complaints about unwanted calls, with 150,000 complaints in 2016, 185,000 complaints in 2017, and 232,000 complaints in 2018. *Consumer Complaint Data Center*, FCC, www.fcc.gov/consumer-help-center-data [https://archive.is/wip/ojuBF].

## Factual Allegations

22. Direct Energy is an electric generation supplier that attempts to sell its services to residents of various states, including Pennsylvania.

23. To generate business through sales, Direct Energy relies on telemarketing.

5

24. However, Direct Energy's contact with the potential new customers is limited, and the telemarketing is conducted by third parties, such as KAA Energy.

25. One of Direct Energy's strategies for telemarketing involves the use of *en masse* telemarketing to solicit business by third parties.

26. Through this method, Direct Energy shifts the burden of wasted time to the consumers it calls with unsolicited messages.

27. Furthermore, those calls violate the TCPA when they are made using an automated dialing system to cellular telephones, as they were with Mr. Shelton.

<u>The Call to Mr. Shelton</u>

28. Plaintiff is a "person" as defined by 47 U.S.C. § 153(39).

29. Plaintiff's telephone number is (484) 626-XXXX.

30. Mr. Shelton has listed that number on the National Do Not Call Registry.

31. The Plaintiff is assigned to a cellular telephone service.

32. KAA Energy placed a telemarketing call to Plaintiff's number on March 18, 2020.

33. When the Plaintiff answered the call, there was what he believes was at least a ten-second pause.

34. During that time, the Plaintiff stated "hello" at least three times with no response.

35. This significant pause and delay is consistent with the use of a ViciDial dialing system.

36. The ViciDial system can also produce numbers using a sequential number generator and dial the numbers automatically.

37. The dialing system can do this by inputting a straightforward computer command.

38. Following a command, the dialing system will sequentially dial numbers.

39. In that scenario, the dialing system could dial a number such as (555) 000-0001, then (555) 000-0002, and so on.

40. This would be done without any human intervention or further effort.

41. The Caller ID Number on the call was (878) 378-0037.

42. The number is a non-working or "spoofed" Caller ID.

43. That number is a Caller ID for New Jersey.

44. The Defendants are not located in New Jersey.

45. However, the Defendants used a local Caller ID number.

46. The spoofed Caller ID number was used to mislead call recipients.

47. This is also consistent with the use of an ATDS.

48. The company was not identified through its Caller ID or at the start of the telemarketing call, so the Plaintiff went through the telemarketing process so he could identify the company.

49. During the call, "Mark" claimed he was calling from Direct Energy.

50. The Plaintiff identified Direct Energy because he received a verification that it was Direct Energy calling from a third-party verification company as part of the telemarketing pitch for the call he received.

51. Direct Energy confirmed that it was KAA Energy who physically dialed the call.

52. Plaintiff and the other call recipients were harmed by the calls. They were temporarily deprived of legitimate use of their phones because the phone line was tied up during the telemarketing calls, and their privacy was improperly invaded. Moreover, the calls injured Plaintiff and the other call recipients because they were frustrating, obnoxious, annoying, were a nuisance, and disturbed the solitude of Plaintiff and the class.

7

**Direct Energy's Liability and Its Arrangement with KAA Energy**

53. For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the TCPA*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

54. On May 9, 2013, the FCC released a Declaratory Ruling holding that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013) ("May 2013 FCC Ruling").

55. In that ruling, the FCC instructed that sellers such as Direct Energy may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "[s]ellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*Id.* at 6588 ¶ 37 (internal citations omitted).

56. The May 2013 FCC Ruling held that, even absent evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for

8

telemarketing call if the telemarketer "has apparent (if not actual) authority" to make the call. *Id.* at 6586 ¶ 34.

57. The May 2013 FCC Ruling further clarifies the circumstances under which a telemarketer has apparent authority:

> [A]pparent authority may be supported by evidence that the seller allows the outside sales entity access to information and systems that normally would be within the seller's exclusive control, including: access to detailed information regarding the nature and pricing of the seller's products and services or to the seller's customer information. The ability by the outside sales entity to enter consumer information into the seller's sales or customer systems, as well as the authority to use the seller's trade name, trademark and service mark may also be relevant. It may also be persuasive that the seller approved, wrote or reviewed the outside entity's telemarketing scripts. Finally, a seller would be responsible under the TCPA for the unauthorized conduct of a third-party telemarketer that is otherwise authorized to market on the seller's behalf if the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct.

*Id.* at 6592 ¶ 46.

58. By engaging KAA Energy to make calls on behalf of its agents to generate new business, Direct Energy "manifest[ed] assent to another person … that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency, § 1.01.

59. Moreover, Direct Energy maintained interim control over KAA Energy's actions.

60. For example, Direct Energy controlled the states that it allowed KAA Energy to call.

61. Direct Energy instructed KAA Energy on what telephone numbers not to call.

9

62. Direct Energy also gave interim instructions to KAA Energy by providing the volume of calling and new customers it would purchase.

63. KAA Energy transferred customer information directly to Direct Energy's third party vendor, who had the ability to bind them in contract. Thus, the company that Direct Energy hired has the "ability … to enter consumer information into the seller's sales or customer systems," as discussed in the May 2013 FCC Ruling. As such, the company that Direct Energy hired is an apparent agent of Direct Energy.

64. Direct Energy also ratified KAA Energy's conduct by accepting the benefits of KAA Energy's calling activity, including the business origination of Mr. Shelton's verification.

65. In fact, Mr. Shelton had previously sued Direct Energy and KAA Energy for KAA Energy's automated call to Mr. Shelton.

66. Despite this prior lawsuit, KAA Energy made another automated call to Mr. Shelton's same cellular telephone number.

67. Finally, the May 2013 FCC Ruling states that called parties may obtain "evidence of these kinds of relationships … through discovery, if they are not independently privy to such information." 28 FCC Rcd. at 6592-593 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

### Class Action Allegations

68. As authorized by Rule 23(b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of a class of all other persons or entities similarly situated throughout the United States.

69. The class of persons Plaintiff proposes to represent is tentatively defined as:

> All persons within the United States to whom: (a) KAA Energy, and/or a third party acting on its behalf, made one or more non-emergency telephone calls; (b) to a cellular telephone number; (c) using the same or a similar telephone system used in calling Plaintiff; and (d) at any time in the period that begins four years before the date of the filing of this Complaint to trial.

70. Excluded from the class are the Defendants, and any entities in which the Defendants have a controlling interest, the Defendants' agents and employees, any judge to whom this action is assigned, and any member of such judge's staff and immediate family.

71. The class as defined above is identifiable through phone records and phone number databases.

72. The number of potential class members is likely at least in the thousands, since automated telemarketing campaigns make calls to hundreds of thousands of individuals a day. Individual joinder of these persons is impracticable.

73. Plaintiff Shelton is a member of the class.

74. There are questions of law and fact common to Plaintiff and to the proposed class, including but not limited to the following:

   a. Whether KAA Energy made the calls at issue with an ATDS as that term is defined by the TCPA;

   b. Whether Direct Energy is vicariously liable for KAA Energy's telemarketing conduct;

   c. Whether Defendants placed calls without obtaining the recipients' prior consent for the calls; and

   d. Whether the Plaintiff and the class members are entitled to statutory damages because of Defendants' actions.

75. Plaintiff's claims are typical of the claims of class members. Plaintiff's claims, like the claims of the class, arise out of the same common course of conduct by Defendants and are based on the same legal and remedial theories.

76. Plaintiff is an adequate representative of the class because his interests do not conflict with the interests of the class, he will fairly and adequately protect the interests of the class, and he is represented by counsel skilled and experienced in class actions, including TCPA class actions.

77. Common questions of law and fact predominate over questions affecting only individual class members. The only individual question concerns identification of class members, which will be ascertainable from records maintained by Defendants and/or their agents.

78. Management of these claims is likely to present significantly fewer difficulties than are presented in many class claims because the calls at issue are all automated. Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources, promotes consistency and efficiency of adjudication, provides a forum for small claimants, and deters illegal activities. There will be no significant difficulty in the management of this case as a class action.

79. The likelihood that individual members of the class will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

80. Plaintiff is not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

## Legal Claims

### Count One:
### Violation of the TCPA's Prohibition Against Automated Telemarketing

81. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

82. The foregoing acts and omissions of Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf constitute numerous and multiple violations of the TCPA, 47 U.S.C. § 227, by making calls, except for emergency purposes, to the telephone numbers of Plaintiff and members of the class using an ATDS.

83. As a result of Defendants' and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf's violations of the TCPA, 47 U.S.C. § 227, Plaintiff and members of the class presumptively are entitled to an award of $500 in damages for each and every call made to their cellular telephone numbers using an ATDS, pursuant to 47 U.S.C. § 227(b)(3)(B).

84. Plaintiff and members of the class are also entitled to and do seek injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from making calls, except for emergency purposes, to any cellular telephone numbers using an ATDS in the future.

85. The Defendants' violations were negligent and/or knowing.

### Relief Sought

WHEREFORE, for himself and all class members, Plaintiff requests the following relief:

A. Injunctive relief prohibiting Defendants and/or their affiliates, agents, and/or other persons or entities acting on Defendants' behalf from making calls, except for emergency purposes, to any cellular telephone numbers using an ATDS in the future;

B. Because of Defendants' violations of the TCPA, Plaintiff seeks for himself and the other putative class members $500 in damages for each violation or—where such regulations were willfully or knowingly violated—up to $1,500 per violation, pursuant to 47 U.S.C. § 227(b)(3);

C. An order certifying this action to be a proper class action under Federal Rule of Civil Procedure 23, establishing any appropriate classes the Court deems appropriate, finding that Plaintiff is a proper representative of the class, and appointing the lawyers and law firms representing Plaintiff as counsel for the class; and

D. Such other relief as the Court deems just and proper.

**Plaintiff requests a jury trial as to all claims of the complaint so triable.**

PLAINTIFF,
By his attorneys,

Joseph F. Murray (327925)
Brian K. Murphy (*pro hac vice* to be filed)
Jonathan P. Misny (*pro hac vice* to be filed)
Murray Murphy Moul + Basil LLP
1114 Dublin Road
Columbus, OH 43215
Telephone: 614.488.0400
Facsimile: 614.488.0401
E-mail: murray@mmmb.com
murphy@mmmb.com
misny@mmmb.com

Anthony I. Paronich (*pro hac vice* to be filed)
Paronich Law, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com

Edward A. Broderick (*pro hac vice* to be filed)
Broderick Law P.C.
99 High Street, Suite 304
Boston, MA 02110
Telephone: 508.221.1510
Facsimile: 617.830.0327
E-mail: ted@broderick-law.com

Matthew P. McCue (*pro hac vice* to be filed)
The Law Office of Matthew P. McCue
1 South Avenue, Suite 3
Natick, MA 01760
Telephone: 508.655.1415
Facsimile: 508.319.3077
Email: mmccue@massattorneys.net